DUGAN W.E. BLISS
blissd@sec.gov
GREGORY A. KASPER
kasperg@sec.gov
L. JAMES LYMAN
lymanl@sec.gov
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SECURITIES AND EXCHANGE COMMISSION,

Plaintiff,

- against -

XIAOYU XIA and YANTING HU,

Defendants.

15 Civ. 3320

**COMPLAINT AND JURY DEMAND**

**ECF CASE**

JUDGE PAULEY

---

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against defendants Xiaoyu Xia ("Xia") and Yanting Hu ("Hu") (collectively, "Defendants"), alleges as follows:

## SUMMARY

1. This is an insider trading case involving highly suspicious and highly profitable trading by Defendants in the securities of 58.com Inc. ("58.com") just prior to an April 14, 2015 news story disclosing – and an April 17, 2015 press release confirming – that 58.com, Tencent Holdings, and Ganji.com had agreed to a deal whereby 58.com would purchase 43% of Ganji.com for $412 million and Tencent Holdings would make a concurrent $400 million

investment in 58.com. Following the April 14, 2015 news story, 58.com's stock price rose 33.52% over the previous trading day's closing price, with another 4.34% price increase on April 17, 2015 when 58.com confirmed the deal. Defendants are Chinese nationals who traded through U.S. brokerage accounts, whose remarkably timed purchase of speculative, out-of-the-money call options in 58.com – shortly before news of the deal was disclosed – resulted in combined realized and unrealized profits of over $2,000,000. Defendants are both connected to the financial industry in China and, on information and belief, purchased 58.com options while in possession of material, nonpublic information concerning the deal between 58.com, Tencent Holdings, and Ganji.com.

## NATURE OF THE PROCEEDINGS AND REQUESTED RELIEF

2.  The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)]. The Commission seeks permanent injunctions against each of the Defendants, enjoining them from engaging in the transactions, acts, practices, and courses of business alleged in this Complaint, disgorgement of all ill-gotten gains from the unlawful insider trading activity set forth in this Complaint, together with prejudgment interest, and civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1]. The Commission seeks any other relief the Court may deem appropriate pursuant to Section 21(d)(5) of the Exchange Act [15 U.S.C. § 78u(d)(5)].

## JURISDICTION AND VENUE

3.  This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u(e), and 78aa].

4. Venue lies in this Court pursuant to Section 21(d), 21A, and 27 of the Exchange Act [15 U.S.C. § 78u(d), 78u-1, and 78aa]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within the Southern District of New York and elsewhere, and were effected, directly or indirectly, by making use of means or instrumentalities of transportation or communication in interstate commerce, or the mails, or the facilities of a national securities exchange. 58.com stock is traded on the New York Stock Exchange and the options that Defendants purchased were traded on a number of different options exchanges, including ISE Gemini, ISE, and Nasdaq BX, all of which are located in the Southern District of New York.

## DEFENDANTS

5. **Xiaoyu Xia**: Xia is a Chinese citizen and resident of Beijing, China. He is the Managing Director of an equity investment firm located in Shanghai, China. Previously, he was a Director at the Beijing office of a large U.S. private equity firm and a Partner and head of the Beijing office of a large U.S. consulting firm.

6. **Yanting Hu**: Hu is a Chinese citizen and resident of Beijing, China. Hu is an employee of the Beijing branch of a Chinese airline.

## FACTS

### 58.com, Tencent Holdings, and Ganji.com

7. 58.com is a Cayman Islands entity with principal executive offices in Beijing, China.

8. 58.com is a holding company whose primary business is the operation of an e-commerce website that is similar to the U.S. website craigslist.com.

9. 58.com securities are traded in the United States on the New York Stock Exchange using the ticker WUBA. The securities are traded as American depositary receipts ("ADRs"), which is a method for issuers of foreign stock to have their stock traded on U.S. exchanges in dollar denominated shares.

10. Tencent Holdings ("Tencent") is a Cayman Islands entity with principal executive offices in Shenzhen, China.

11. Tencent is a publicly traded holding company quoted on the Hong Kong Stock Exchange.

12. Tencent's subsidiaries provide internet, e-commerce, and entertainment services.

13. In June 2014, Tencent purchased approximately 20% of 58.com's ADR shares. In October 2014, Tencent purchased an additional 5% of 58.com's ADR shares.

14. Ganji.com is a similar, but smaller, e-commerce company to 58.com, with headquarters in Beijing, China.

15. The Chinese entities that own Ganji.com are wholly owned by holding company Falcon View Technology Limited, which is owned by a limited group of private investors.

**58.com's March 14, 2015 Acquisition Agreement and the April 14, 2015 News Story**

16. On March 14, 2015, 58.com, Tencent, and Ganji.com entered into a memorandum of understanding whereby 58.com agreed to purchase 43% of its rival, Ganji.com, for $412 million and Tencent, 58.com's largest shareholder, agreed to make a concurrent $400 million cash investment in 58.com to fund the Ganji.com acquisition (Tencent's $400 million investment in 58.com and 58.com's simultaneous $412 million investment in Ganji.com is referred to collectively herein as the "Deal").

17. Although the Deal was memorialized in a March 14, 2015 memorandum of understanding, it was not made public until 10:12 a.m. (ET) on April 14, 2015, when the Financial Times first reported it (the "News Story").

18. Following the News Story, 58.com's share price increased 33.52% in one day to $67.87, the highest price since 58.com's October 2013 debut.

19. 58.com trading volume on April 14, 2015, was approximately 16.5 million shares – 22 times its three-month average.

20. 58.com confirmed the Financial Times story in a press release issued before the U.S. markets opened on April 17, 2015, leading to another 4.34% increase in the share price (the "Press Release").

21. Prior to the News Story, 58.com's record closing price was $58.32 on March 7, 2014.

## Xiaoyu Xia's Trading in 58.com Options

22. On March 22, 2015, Xia submitted a Non-US Person Brokerage Account Application, along with an Options Application, to Scottrade, a U.S.-based broker-dealer.

23. In his Options Application, Xia stated that he has an annual income of $300,000, a net worth of $7 million, and liquid assets of $3 million.

24. Between March 27 and March 31, 2015, Xia transferred $900,000 into his Scottrade account.

25. Beginning on March 31 and continuing through April 7, 2015, Xia began making daily purchases of 58.com call options expiring in October 2015 and January 2016.

26. Although 58.com stock was trading between $51 and $54 per share on the dates of purchase – and 58.com's record closing price in its history had been $58.32 on March 7, 2014 – the strike price for the options Xia purchased ranged from $60 to $70.

27. Xia purchased the following options:

   a. WUBA $70.00 October 2015 Call Options (1 purchase for a total 300 contracts)

   b. WUBA $70.00 January 2016 Call Options (4 purchases for a total 635 contracts)

   c. WUBA $65.00 January 2016 Call Options (6 purchases for a total 550 contracts)

   d. WUBA $60.00 January 2016 Call Options (4 purchases for a total 500 contracts)

28. In total, Xia made 15 individual options purchases, totaling 1,985 options contracts, with each option contract conferring the right to buy or 100 shares of stock at the given strike price.

29. The purchases were executed on a number of different U.S.-based options exchanges, including exchanges located in Manhattan, New York.

30. Xia's purchases totaled $899,327 – nearly his entire account value.

31. As of April 17, 2015, Xia had only purchased the out-of-the-money 58.com call options outlined above; he had not purchased equities or options in any other issuer, nor had he purchased any other financial products in his account.

32. The $899,327 invested in out-of-the-money options comprised 30% of Xia's claimed liquid assets, and nearly 15% of his claimed net worth.

33. Because all of the 58.com options had call prices that were higher than 58.com's trading price, and all were higher than 58.com's highest per-share price in its trading history,

without a significant increase in 58.com's share price to record levels, these options would have expired worthless.

34. After the News Story and the Press Release, the value of Xia's 58.com call options increased from his initial investment of $899,327 to over $2.5 million.

35. As of April 17, 2014, Xia had not sold any of the options contracts therefore he had not yet locked in an exact profit amount. Nonetheless, Xia had an approximate unrealized profit of $1,690,573 based on the high trading price on April 17, 2015 (the day of the Press Release) (Xia's approximate unrealized profit was $1,592,023 at the close of the market on April 14, 2015 (the day of the News Story)).

36. Xia, through his current employment at an investment fund, and through his prior employment in private equity and management consulting, is tied to a network of advisors and financial industry professionals who are regularly called upon to work on transactions such as the Deal, and therefore Xia may have access to the types of people who may be aware of inside information concerning large institutional investments and transactions.

37. In summary, the trading in Xia's account includes the following indicators of unusual or suspicious trading:

    a. Xia opened the Scottrade account after the Deal but before the News Story;

    b. In the time period between the Deal and the News Story, Xia made 15 different options purchases, comprising 1985 options contracts, at a cost of approximately $899,327, which is approximately 30% of Xia's claimed liquid assets;

    c. All of the purchases occurred within 14 days of the date of the News Story;

    d. The strike prices for the options were $60, $65, and $70, all of which were above the record high for 58.com stock and represented a significant increase over the current trading price;

    e. Xia did not purchase a single other security in his account as of April 17, 2015;

    f. By virtue of his current employment and employment history, Xia may be connected to the types of people who may have access to information relating to institutional investments and large transactions; and

    g. Xia is a Chinese citizen living in China, and the entities involved in the Deal are all companies operating exclusively in China.

### **Yanting Hu's Trading in 58.com Options**

38. Hu opened an account at Interactive Brokers, a U.S.-based broker-dealer, on August 29, 2014, and funded the account on September 8, 2014.

39. In her account information, Hu represented that she had an annual income of $100,001 to $150,000, a net worth of $500,001 to $1,000,000, and liquid assets of $250,001 to $500,000.

40. Between September 2014 and March 2015, Hu engaged in light trading of a handful of securities and options, consistently losing money on a monthly basis.

41. Hu's brokerage account balance hit a high of $160,740 on October 31, 2014, based exclusively on cash deposits, and had declined to $128,774 by March 31, 2015, due to monthly trading losses.

42. Prior to April 7, 2015, Hu had never traded 58.com stock or options.

43. Beginning on April 7, 2015, and continuing until just minutes after the News Story, Hu purchased a series of 58.com call option contracts with expiration dates of April 17, 2015, and May 15, 2015.

44. Hu purchased the following options:

    a. WUBA $60.00 April 17, 2015 Call Options (4 purchases for a total 780 contracts)

    b. WUBA $60.00 May 15, 2015 Call Options (8 purchases for a total 540 contracts)

45. In total, Hu made 12 individual options purchases, totaling 1,320 options contracts, with each option contract conferring the right to buy or 100 shares of stock at the given strike price.

46. The purchases were executed on a number of different U.S.-based options exchanges, including exchanges located in Manhattan, New York.

47. Hu's purchases totaled approximately $127,130, plus commissions – nearly the entire $128,774 value of her account on March 31, 2015, and more than 25% to 50% of her claimed liquid assets.

48. Of the 12 purchases, all but one came before the News Story, and one came roughly thirty-eight minutes after the News Story, but still two days before the Press Release.

49. Hu purchased 780 58.com $60.00 April 17, 2015 Call Options on April 7, 8, and 9. These options were set to expire on April 17, 2015, within 8 days of the last purchase on April 9. For these options to have value at expiration, based on the 58.com closing price of $54.18 on April 9, 2015, the stock price would have had to increase 10.74% in 6 trading days. And at an average option price of roughly $.35, the stock would have had to increase 11.39% in 6 trading days just for Hu to break even.

50. On April 13, 2015, Hu sold 500 of her expiring April options at a loss, then the next day (prior to the 10:12 a.m. ET News Story) purchased additional options with a later May 15, 2015 expiration.

51. Hu purchased options, all of which expired in either 10 or fewer days, or 40 or fewer days, with a strike price of $60, despite 58.com's stock price hovering between $51 and $54 per share on the dates of purchase, and despite 58.com's record closing price having been $58.32 on March 7, 2014.

52. The nearly $130,000 that Hu invested in out-of-the-money 58.com call options comprised at least 25% to 50% of Hu's claimed liquid assets.

53. After the News Story, the value of Hu's 58.com call options rose substantially. By April 17, 2015, Hu had sold all but 45 of her 1,320 options contracts, with a realized profit of $384,807.23. Hu continued to hold 45 contracts, reflecting an approximate unrealized profit of $36,902.70 based on the high trading price on April 17, 2015 (the day of the Press Release) (Hu's approximate unrealized profit was $29,162.70 at the close of the market on April 14, 2015 (the day of the News Story)).

54. In total, Hu profited over $400,000 from her 58.com options trades and nearly doubled her claimed net worth.

55. Hu is, on information and belief, closely associated with an individual who works for a large multinational investment bank in Hong Kong. This investment bank has historically assisted Tencent with financing matters including work earlier in 2015. Account access logs at Interactive Brokers show that this associated individual has, at times, shared an IP address and MAC address in common with Hu, indicating shared use of a computer or network.

56. In summary, the trading in Hu's account includes the following indicators of unusual or suspicious trading:

   a. Hu never traded in 58.com securities in her Interactive Brokers account prior to the highly profitable April 2015 option trades;

   b. Hu had limited account activity, trading only a handful of equities, options, and other securities in her account since she opened it in September 2014;

   c. Hu lost money in every month of trading prior to April 2015, and her March 31, 2015 account statement reflected a -10.33% time weighted rate of return;

   d. Hu's option purchases cost $127,130, plus commissions —nearly the entire $128,774 value of her account on March 31, 2015, and more than 25% to 50% of her claimed liquid assets;

   e. All of the purchases occurred within 7 days of the date of the News Story;

   f. The strike price for the options was $60, which was above the record high for 58.com stock and represented a significant increase over the trading price;

   g. 58.com stock would have had to increase 11.39% in 6 trading days, and reach a record high price, for Hu to break even on the April 17 options; and

   h. Hu is a Chinese citizen living in China, and the entities involved in the Deal are all companies operating exclusively in China.

### Defendants' Possession of, and Trading on, Material Nonpublic Information

57.     Upon information and belief, at the time Defendants purchased options in 58.com stock, as alleged above, they were in possession of material, nonpublic information about the Deal. Defendants: (a) knew, recklessly disregarded, or should have known that their trading was in breach of a fiduciary duty, or obligation arising from a similar relationship of trust and confidence, owed to the shareholders of 58.com, or to the source from whom they received or obtained the material, nonpublic information; and/or (b) knew, recklessly disregarded, or should have known, that the material, nonpublic information about the Deal that had been obtained by them or conveyed to them was disclosed or misappropriated in breach of a fiduciary duty, or similar relationship of trust and confidence.

58.     Upon information and belief, any and all material, nonpublic information that Defendants received concerning the Deal that was disclosed to them by any person was tipped by such person with the expectation of receiving a benefit, such person did in fact receive a benefit, and Defendants knew of such benefit.

### CLAIM FOR RELIEF

### Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder
### (Against All Defendants)

59.     The Commission realleges and incorporates by reference paragraphs 1 through 58, as though fully set forth herein.

60.     By virtue of the foregoing, Defendants, singly or in concert with others, in connection with the purchase or sale of securities, by the use of the means or instrumentalities of interstate commerce, or of the mails, or a facility of a national securities exchange, directly or

indirectly: (a) employed devices, schemes or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices or courses of business which operated or would have operated as a fraud or deceit upon persons.

61. By virtue of the foregoing, Defendants, directly or indirectly, violated, and unless enjoined, will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5).

## RELIEF SOUGHT

**WHEREFORE**, the Commission respectfully requests that this Court enter a show cause order and an order temporarily and preliminary freezing Defendants' assets in the accounts in which the trading described in this Complaint occurred, and enter a Final Judgment:

### I.

Permanently restraining and enjoining the Defendants, their officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

### II.

Ordering Defendants to disgorge, with prejudgment interest, all illicit trading profits or other ill-gotten gains received as a result of the conduct alleged in this Complaint;

### III.

Ordering Defendants to pay civil monetary penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. §§ 78u(d)(3), 78u-1];

### IV.

Granting such other and further relief as this Court may deem just and proper.

### JURY DEMAND

The Commission demands a trial by jury on all claims so triable.

Dated: April 29, 2015

/s/

Dugan W.E. Bliss (*pro hac* admission pending)
Senior Trial Counsel
Gregory A. Kasper (NY 2735405; SDNY GK6596)
Regional Trial Counsel
L. James Lyman (*pro hac* admission pending)
Counsel
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
1961 Stout Street, 17th Floor
Denver, Colorado 80294
(303) 844-1000
blissd@sec.gov
kasperg@sec.gov
lymanl@sec.gov